446 S.E.2d 906

STATE of West Virginia ex rel. Carrie Olean DeFRANCES, Ronald C. Kopp, Mary Jo Southern, John A. DeFrances, John Alfred DeFrances, Veronica Aman, David A. DeFrances, James C. De-Frances, Paul Henry Kopp, Ronald C. Kopp, Jr., Thomas Andrew Kopp, James Lee Southern, John Paul Southern and Bruce Edward Southern, Petitioners,

v.

Honorable Thomas A. BEDELL, Judge of the Circuit Court of Harrison County, Pete L. Olean, E. James Olean, in Their Individual Capacities and as Executors of the Estate of Luke A. Olean, Rose Olean and Andrew James Olean, Respondents.

No. 22216.

Supreme Court of Appeals of West Virginia.

Submitted June 7, 1994.

Decided July 7, 1994.

514

William T. Belcher, Harry P. Waddell, Steptoe & Johnson, Clarksburg, for petitioners.

David J. Romano, Gregory H. Schillace, Clarksburg, for Pete L. Olean, E. James Olean, Rose Olean and Andrew James Olean.

PER CURIAM:

The relators, certain beneficiaries of the estate of Luke A. Olean [1], seek to vacate an order entered by Thomas A. Bedell, Judge of the Circuit Court of Harrison County, disqualifying the law firm of Steptoe & Johnson from representing the relators in *DeFrances et al. v. Olean et al.*, Civil Action No. 93–C–203–2 (Complaint Filed Mar. 17, 1993). The circuit court disqualified Steptoe & Johnson because of one brief meeting between the decedent and Robert M. Steptoe, Jr., a partner in Steptoe & Johnson, during which Mr. Steptoe described the services available from Steptoe & Johnson for estate planning. The defendants below [2] argue that because of this meeting, Steptoe & Johnson have a conflict of interest and are disqualified from representing the relators. Because the evidence shows that an attorney-client relationship never existed between the decedent and Steptoe & Johnson, this Court grants the relators a writ of prohibition.

On June 9, 1985, Luke A. Olean drafted a holographic will naming Pete L. Olean and E. James Olean as co-executors. By this will, the bulk of Mr. Olean's estate was bequeathed to E. James Olean, Pete L. Olean, Carrie Olean DeFrances, Elizabeth Olean Kopp and survivors. Certain of Mr. Olean's stock was to be equally divided among Mr. Olean's nieces, nephews and their children.

Some time after Mr. Olean drafted his will, his brother, Dr. Ralph F. Olean, contacted Mr. Steptoe and requested he meet with the two brothers to discuss possible representation of Mr. Olean by Steptoe & Johnson in the estate planning area. Mr. Steptoe, who does not practice in wills and estates, met alone with the brothers. According to Mr. Steptoe, the meeting was brief and cursory because Mr. Olean was not very talkative and did not appear enthusiastic about the visit.

Mr. Steptoe believes he would have informed Mr. Olean about the types of services offered by his firm and may have generally discussed the subjects of wills and taxes. However, Mr. Steptoe does not recall any in-depth discussion because wills and estates are not within Mr. Steptoe's areas of practice and no confidential information was disclosed by Mr. Olean. Mr. Steptoe was not asked for and did not offer any legal advice. Mr. Olean left the meeting without engaging Steptoe & Johnson, and he never again communicated with Steptoe & Johnson. Steptoe & Johnson billed no time in connection with the meeting and retained no records relating to Mr. Steptoe's meeting with Mr. Olean. This one hour meeting was the entire contact between Mr. Olean and Steptoe & Johnson.

Approximately 10 months before his November 16, 1992 death, Mr. Olean executed a general power of attorney appointing Pete L. Olean his attorney-in-fact. The relators allege that Mr. Olean was in failing physical and mental condition when he executed the power of attorney and that Pete L. Olean exploited the power of attorney by unfairly influencing Mr. Olean to transfer stock and other assets to the defendants below without receiving adequate consideration.

After Mr. Olean's will was probated and when the relators learned of the transfers, they contacted Steptoe & Johnson seeking legal representation. Before undertaking representation of the relators, Steptoe & Johnson reviewed with Mr. Steptoe his preliminary consultation with the decedent and decided that this preliminary consultation would not conflict with the firm's representation of the petitioners. Except for his input concerning the conflict of interest issue, Mr. Steptoe maintains that he has not discussed this case with the members of his firm representing the relators.

1. The relators include the decedent's sister, Carrie Olean DeFrances, nephews, Ronald C. Kopp and John A. DeFrances, niece, Mary Jo Southern and the following great nieces and nephews: Veronica Aman, John Alfred DeFrances, David A. DeFrances, James C. DeFrances, Paul Henry Kopp, Ronald C. Kopp, Jr., Thomas Andrew Kopp, James Lee Southern, John Paul Southern, and Bruce Edward Southern.

2. The defendants below include: Pete L. Olean and E. James Olean, who are co-executors of the decedent's estate and beneficiaries, Rose Olean and Andrew James Olean.

On March 17, 1993, the relators filed a complaint alleging that the defendants breached a fiduciary duty to the decedent and/or wrongfully exerted undue influence to acquire assets that properly belong to the estate. The defendants answered and alleged that because of Steptoe & Johnson's former representation of Mr. Olean, Steptoe & Johnson have a conflict of interest adverse to the defendants. The defendants again raised the conflict of interest issue in responding to the relators' motion for a preliminary injunction. On September 17, 1993, during the preliminary injunction hearing, the circuit court requested the conflict of interest issue be raised by a separate motion. On December 3, 1993, the defendants filed a motion to disqualify Steptoe & Johnson. After the circuit court disqualified Steptoe & Johnson, the relators sought relief in this Court by requesting a writ of prohibition.

## I

In *Hinkle v. Black*, 164 W.Va. 112, 121, 262 S.E.2d 744, 749 (1979), we noted that "a remedy by appeal of a crucial but erroneous legal ruling is frequently quite inadequate, particularly if we are realistic in our definition of 'adequacy' and recognize that part of adequacy has to do with expense and time." The relators maintain that the denial of their choice of lawyers has potential for great harm and that correcting the error on appeal would necessitate a duplication "of effort among the litigants, lawyers and courts. [Footnote omitted.]" *Hinkle*, 164 W.Va. at 118, 262 S.E.2d at 748. The defendants attempt to distinguish this conflict of interest case from our line of conflict cases permitting the use of a writ of prohibition, by noting that unlike most of our conflict cases, this case concerns the granting of a motion to disqualify, rather than the denial of the disqualification.

■ Our rule for determining when prohibition is the appropriate remedy was stated in Syl. pt. 1, *Hinkle:*

In determining whether to grant a rule to show cause in prohibition when a court is not acting in excess of its jurisdiction, this Court will look to the adequacy of other available remedies such as appeal and to the over-all economy of effort and money among litigants, lawyers and courts; however, this Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance.

*See State ex rel. Erickson v. Hill,* 191 W.Va. 320, 323, 445 S.E.2d 503, 506 (1994); Syl. pt. 2, *State ex rel. Chesapeake and Potomac Telephone Co. of W.Va. v. Ashworth,* 190 W.Va. 547, 438 S.E.2d 890 (1993).

■ In this case, the relators argue that if they must wait to appeal the disqualification of the lawyers they selected, they would need new counsel to proceed. The duplication of efforts would impose undue costs on the relators and delay their civil action. Because the relators have met the *Hinkle* standard for considering a discretionary writ of prohibition, we now turn to the arguments concerning the disqualification of Steptoe & Johnson.

## II

■ The defendants below maintain that Rule 1.9 of the *Rules of Professional Conduct* [1988] prohibits Steptoe & Johnson from representing the relators. Rule 1.9 states:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or substantially related matter in which that person's interest [sic] are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3

would permit or require with respect to a client or when the information has become generally known.

Recently in *State ex rel. McClanahan v. Hamilton,* 189 W.Va. 290, 430 S.E.2d 569 (1993) (disqualifying a prosecutor from prosecuting a former client for malicious assault of her husband because of his former representation of her in a divorce action based on the husband's cruel and inhuman treatment), we stated that, "Rule 1.9(a) of the Rules of Professional Conduct, precludes an attorney who has formerly represented a client in a matter from representing another person in the same or a substantially related matter that is materially adverse to the interests of the former client unless the former client consents after consultation." Syl. pt. 2, *McClanahan. In accord* Syl. pt. 4, *West Virginia Canine College v. Rexroad,* 191 W.Va. 209, 444 S.E.2d 566 (1994). However, in order for Rule 1.9 to apply, an attorney-client relationship must have existed with a former client.

█ The determination of when an attorney-client relationship exists is not determined by the *Rules of Professional Conduct.* The Scope of the Rules states:

Furthermore, for purposes of determining the lawyer's authority and responsibility, principles of substantive law external to these Rules determine whether a client-lawyer relationship exists. Most of the duties flowing from the client-lawyer relationship attach only after the client has requested the lawyer to render legal services and the lawyer has agreed to do so. But there are some duties, such as that of confidentiality under Rule 1.6, that may attach when the lawyer agrees to consider whether a client-lawyer relationship shall be established. Whether a client-lawyer relationship exists for any specific purpose can depend on the circumstances and may be a question of fact.

The relationship of attorney and client is a matter of contract, expressed or implied. In Syl. pt. 1 of *Keenan v. Scott* 64 W.Va. 137, 61 S.E. 806 (1908), we gave the following description of when an attorney-client relationship begins:

As soon as the client has expressed a desire to employ an attorney, and there has been a corresponding consent on the part of the attorney to act for him in a professional capacity, the relation of attorney and client has been established; and all dealings thereafter between them relating to the subject of the employment will be governed by the rules applicable to such relation.

*See Western Auto Supply Co. v. Dillard,* 153 W.Va. 678, 685, 172 S.E.2d 388, 393 (1970); *State ex rel. Magun v. Sharp,* 143 W.Va. 594, 596, 103 S.E.2d 792, 794 (1958).

█ The attorney-client relationship can exist without an agreement for compensation. *See Weimer–Godwin v. Board of Educ. of Upshur County,* 179 W.Va. 423, 429, 369 S.E.2d 726, 732 (1988) ("[a]ll that is required is the existence of a relationship of attorney and client, a status which can exist without an agreement for compensation"); *Orndorff v. West Virginia Dept. of Health,* 165 W.Va. 1, 4–6, 267 S.E.2d 430, 432 (1980); *Keenan, supra,* 64 W.Va. at 144, 61 S.E. at 809 (an attorney-client relationship "does not require payment of a fee, or an agreement for a fee, to establish such relationship"). We also note that "we concur with other courts which have held that an attorney-client relationship may be implied from the conduct of the parties. [Citations omitted.]" *Committee on Legal Ethics of West Virginia State Bar v. Simmons,* 184 W.Va. 183, 186, 399 S.E.2d 894, 897 (1990) (per curiam). The determination of the existence of an attorney-client relationship depends on each case's specific facts and circumstances. *Simmons, id. See also,* Syl. pt. 3, in part, *McClanahan, supra,* (requiring "an analysis of the facts, circumstances and legal issues" to determine if two representations by the same lawyer involved "a substantially related matter").

Other courts have also looked at the case's specific facts and circumstances to determine when an attorney-client relationship is established. *See B.F. Goodrich Co. v. Formosa*

*Plastics Corp.*, 638 F.Supp. 1050 (S.D.Tex. 1986) (a law firm's participation in a one day "employment interview" with the plaintiff did not create an attorney-client relationship precluding the law firm from representing the defendants in the same case); *Derrickson v. Derrickson*, 541 A.2d 149 (D.C.App. 1988) (a one-hour consultation with the husband discussing the divorce did not preclude the lawyer about eight years later from representing the wife who sought to increase alimony and support payments); *Green v. Montgomery County, Ala.*, 784 F.Supp. 841, 845–47 (M.D.Ala.1992) (a preliminary consultation can create a "fiduciary relationship ... between lawyer and client ... although actual employment does not result." However, based on the facts there was a "reasonable expectation" that the client's disclosures would be confidential); *Herbes v. Graham*, 180 Ill.App.3d 692, 129 Ill.Dec. 480, 483, 536 N.E.2d 164, 167 (1989) (found an attorney-client relationship because "[i]t is likely that under these circumstances the township representatives spoke freely with him [the lawyer] concerning all aspects of their proposed program").

■ In this case, the record shows only one meeting between the decedent and Steptoe & Johnson, which did not influence the decedent. The decedent's will remained unchanged. Steptoe & Johnson did not perform any subsequent service for the decedent. According to Mr. Steptoe, the meeting covered the general subject of estates and taxes but no discussion of specific methods of estate planning or their application to the decedent's circumstances occurred. According to Mr. Steptoe, the decedent was not talkative, did not divulge confidential information and was not interested in the firm's services. After the meeting, the decedent made no attempt to engage Steptoe & Johnson's services in any capacity. The firm billed no time and maintained no records relating to the meeting. Based on these facts and circumstances, we find that the preliminary consultation meeting between the decedent and Steptoe & Johnson did not establish an attorney-client relationship.

■ The defendants also argue that Steptoe & Johnson should be disqualified in order to avoid the appearance of a conflict of interest. Because the decedent during his preliminary consultation with Steptoe & Johnson had the opportunity to disclose confidential information, the subsequent representation of the relators by Steptoe & Johnson, according to the defendants, gives the appearance of a conflict of interest. In *McClanahan, supra*, 189 W.Va. at 294, 430 S.E.2d at 573 (quoting *T.C. Theatre Corp. v. Warner Brothers Pictures*, 113 F.Supp. 265, 268–69 (S.D.N.Y.1953)), we assumed that confidential information would be disclosed "during the course of the former representation." However, we decline to expand that assumption to this case involving a remote, isolated, non-productive meeting, especially given Mr. Steptoe's affidavit that no confidential information was disclosed. *See B.F. Goodrich, supra*, 638 F.Supp. at 1051 (citing *Wilson P. Abraham Const. v. Armco Corp.*, 559 F.2d 250, 253 (5th Cir.1977)) ("because there was no direct attorney-client relationship between the attorney and the party seeking to disqualify him, there was no presumption that confidential information was exchanged between them. Instead the movant would have to prove that fact.").

■ Because no attorney-client relationship existed between the decedent and Steptoe & Johnson and no confidential information was disclosed by the decedent to Steptoe & Johnson, we find that the relators have established sufficient grounds for a writ of prohibition. "The reason for allowing this procedure is to correct clear-cut legal errors which, if not corrected, would result in reversal of the case upon appeal." *McClanahan, supra*, 189 W.Va. at 296, 430 S.E.2d at 575.

For the above stated reasons, we issue a writ of prohibition prohibiting the Circuit Court of Harrison County from disqualifying Steptoe & Johnson from representing the relators.

Writ granted.